# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **JOANNE K. COOPER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:09cv1112 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying Joanne K. Cooper's (Plaintiff) application for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and her application for supplemental security income (SSI) under Title XIV of the Act, 42 U.S.C. § 1381-1383b. Plaintiff has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer. The action is before the undersigned United States Magistrate Judge for final deposition pursuant to the written consent of the parties. <u>See</u> 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for DIB and SSI in December 2003, alleging she was disabled as of February 28, 1996, by nephritis (inflammation of the kidneys), chronic fatigue syndrome, immune dysfunction, depression, anxiety, swollen lymph node, joint pain, and headaches.

(R.[1] at 177-79.)  Her applications were denied initially and after a hearing before Administrative Law Judge (ALJ) Jhane Pappenfus.[2]  (Id. at 38-46, 69-73, 1150.)  The Appeals Council remanded for consideration of evidence that Plaintiff suffered from major depression, recurrent, for the solicitation of evidence from a medical expert on the nature and severity of her physical impairments, including chronic nephritis and chronic fatigue syndrome, and for the solicitation of evidence from a vocational expert (VE) to clarify the effect of assessed limitations on Plaintiff's occupational base.  (Id. at 51-53.)

After a hearing held in January 2008 and supplemental hearings held in July and September 2008 before ALJ Mark A. Brown, the ALJ found that Plaintiff was disabled as of March 8, 2005, but not before.  (Id. at 13-26, 8-16, 30, 36-40, 194-212, 927-1237.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 3-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, James D. Reid, Ph.D., and Morris Alex, M.D., testified at the January hearing.  Vincent Stock, M.A., was present but was not called to testify due to the length of the hearing.  Plaintiff's husband was present but did not testify.

Plaintiff testified that she stopped working in February 1996 because her health "had been up and down" and her boss was getting angry because she was calling in sick.  (Id. at

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

[2]Plaintiff had filed for SSI and DIB in August 1989 and December 1996, but did not pursue these claims after their initial denial.  (Id. at 38, 166-67, 197-98, 299-300.)  These applications also alleged a disability onset date of February 28, 1996.

942.)  In 1982, she was suicidal and was hospitalized for approximately one week.  (Id. at

942-43.)  In approximately 1996, she consulted her family physician, Dr. Scott Kirchner,

for depression.  (Id. at 943.)  The depression caused suicidal thoughts, panic attacks, and

crying spells.  (Id.)  She also had trouble concentrating and with fatigue.  (Id. at 947.)  Her

sleep was disturbed and unpredictable.  (Id.)  He prescribed Zoloft for her and then Prozac

after she had an allergic reaction to the Zoloft.  (Id. at 944.)  She remained on Prozac for

awhile.  (Id.)  She stopped seeing Dr. Kirchner when her medical benefits ran out because

she was no longer working.  (Id. at 945.)  She had also been seeing a social worker,

Rebecca McPherson, but had to stop when her medical benefits stopped.  (Id.)

   She then started seeing doctors with the State Department of Mental Health and did

so until approximately 1998.  (Id. at 949.)  She also briefly saw Dr. Mammon who treated

her for $25 a visit.  (Id. at 950.)  She saw a Dr. Rottnek[3] for an immune deficiency.  (Id. at

963.)  In 1993, 1994, and 1995, she saw a counselor with Catholic Family Services.  (Id.

at 969.)  Since 2001, she has been seeing Larry Gale.  (Id.)  In the past six months, she has

seen him once a week for an hour each session.  (Id. at 970, 973.)  She did not see him in

2003 and 2004 because she spent most of those years in bed with a strep infection, flu-like

symptoms, and fatigue.  (Id. at 973.)

   After deciding that she needed to do work that she could do at home, she tried to go

back to college to get a degree in art.  (Id. at 951.)  She had problems with the classroom

---

[3]When referring to a health care practitioner, the Court will employ the spelling of the
provider's name as it appears in his or her medical records when there is a discrepancy between
that spelling and the one in the hearing transcript.

requirements, but was able to finally get her Bachelor of Fine Arts degree in 2002 by working at home. (Id. at 953, 958.) Her depression made it hard for her to go to classes; consequently, she dropped or was dropped from a lot of classes. (Id. at 953-54.) She never got a job in her field. (Id. at 958.)

In 2002, Plaintiff had surgery on her left ear. (Id. at 959.) She still has decreased hearing in her right ear. (Id. at 960.)

Her medical insurance improved after she married her husband in March 2000. (Id. at 966.) She then started seeing Dr. Nester for her depression and anxiety. (Id.) He prescribed Buspar, then Effexor, and now has returned to the Prozac and Lorazepam. (Id. at 967.)

Plaintiff has problems sleeping. (Id. at 973.) She tries to write things down because she has difficulty concentrating and remembering things. (Id. at 973-74.) In 2003, she started having a lot of joint and muscle pain. (Id. at 974.) One doctor, Dr. Purcell, is monitoring the level of protein in her urine. (Id. at 977.) If it becomes consistently out of control, he will do a biopsy. (Id.) Another doctor, Dr. Budd, diagnosed her with lupus and fibromyalgia. (Id. at 979.) She stopped seeing him after August 2005 and started seeing Dr. James Speiser, another rheumatologist. (Id. at 985.) Dr. Speiser put her on Plaquenil. (Id.) She stopped taking that medication after a month when she developed stomach problems. (Id. at 986.) After those problems were treated with Prevacid, she resumed two weeks earlier taking the Plaquenil. (Id. at 987.)

Plaintiff was hospitalized in September 2006 with a blood clot in her left leg.  (Id. at 994.)  Dr. Speiser suspected it was related to her lupus.  (Id.)  For six months after the clot, she was on Coumadin.  (Id. at 996.)  Plaintiff estimated she was in the emergency room five times in 2004, two or three times in 2005, and two times in 2007.  (Id. at 995.)  She could not remember if she was in 2006.  (Id.)

The effect of Plaintiff's symptoms ebbs and flows.  (Id. at 997.)  On a good day, she cooks supper.  (Id. at 998.)  On a bad day, she stays in her pajamas.  (Id.)  For instance, in the last week, she had four days where she did not get anything done.  (Id. at 999.)

Asked about her activities, Plaintiff testified that she does not mow the lawn.  (Id. at 1000.)  The reference in Dr. Speiser's notes about her doing so was after her husband cut his hand and could not do it.  (Id. at 1000-01.)  She mowed only the front yard that once, but her lawn is small and flat and she became sick afterwards.  (Id. at 1001.)  Her husband walks their dogs, although she will play with them.  (Id. at 1002.)  Another reference to her caring for her mother was when her mother had a heart attack while cleaning Plaintiff's house.  (Id. at 1003.)  She then tried to help her mother by getting her to her doctors once a week.  (Id.)  She and her husband did some shopping for her mother; she selected the groceries and her husband carried them.  (Id. at 1004.)

Dr. Alex asked Plaintiff if any rheumatologist or internist had definitely told her she had lupus.  (Id. at 1008.)  She replied that Dr. Speiser had shortly after she had started seeing him.  (Id. at 1009.)  In reply to the ALJ's question about what he thought were the medical diagnoses documented by the record, Dr. Alex named level 2 obesity but opined

that Plaintiff did not meet the criteria for a diagnosis of lupus. (<u>Id.</u> at 1010.) Nor did she meet the listing criteria for a sleep-related breathing disorder, fibromyalgia, or ischemic heart disease. (<u>Id.</u> at 1011.) There were no listing requirements for chronic fatigue syndrome, but she did not meet the criteria of the National Institutes of Health for such a diagnosis. (<u>Id.</u>) The mild degenerative disease of her thoracic spine, the degenerative arthritis in her right knee, and nephritis also do not meet any listing criteria. (<u>Id.</u> at 1012.) In response to Plaintiff's reference to non-ANA lupus, Dr. Alex replied that such a diagnosis was "[v]ery, very rare" and was made by kidney biopsy. (<u>Id.</u> at 1013.) In addition to her obesity, mild obstructive sleep apnea, mild degenerative disc disease of the thoracic spine, and some degeneration of her right knee, Plaintiff had the occasional proteinuria, but that had no functional impact. (<u>Id.</u> at 1013-14.) He did not question that some of Plaintiff's treating sources were proceeding on the basis that she had systemic lupus erythematosus (SLE) lupus, but repeated that she did not meet the listing criteria for that diagnosis. (<u>Id.</u> at 1014.)

With the impairments he found, he opined that Plaintiff should be limited to light work. (<u>Id.</u> at 1015.)

Dr. Reid, a clinical psychologist, testified that the record supported a finding that Plaintiff's emotional symptoms waxed and waned and supported her diagnosis of a depressive disorder with symptoms of anxiety. (<u>Id.</u> at 1022.) At times she was on psychotropic medication and at times she was not. (<u>Id.</u>) At times, she refused to take such medication and took a herbal supplement. (<u>Id.</u>) He did not think that her emotional

symptoms met or equaled or functionally equaled an impairment of listing-level severity. (Id. at 1022-23.) Dr. Gale was a licensed professional counselor, but could not, in Missouri, administer psychological tests, interpret those tests, or make psychiatric diagnoses with that credential. (Id.) The other problem with Dr. Gale's records was that they were summaries of office visits and not the records of those visits – possibly a violation of the State Board of Healing Arts mandate. (Id. at 1025.) Dr. Reid also questioned why, with the severity described by Dr. Gale, he had not referred Plaintiff to a psychiatrist. (Id. at 1028.)

Dr. Reid was then asked if he agreed with the diagnoses of Dr. Farzana, i.e., recurrent major depression without psychotic features; symptoms of severe depression; and symptoms of anxiety with panic attack. (Id. at 1033.) He did not. (Id. at 1033-34.) He opined that Dr. Farzana made her diagnoses on the basis of information given her to by Plaintiff, information that was "perhaps exaggerated or just mistaken." (Id. at 1034.)

Dr. Reid further testified that Plaintiff's diagnoses of major depression and anxiety are supported by the record, but queried whether they were situational responses. (Id. at 1038-39, 1093-94.) For instance, medical records describe the depression and anxiety as situational because of a conflict with a neighbor or with family. (Id. at 1039.) He opined that Plaintiff did not satisfy the B criteria for Listing 12.04. (Id. at 1040, 1098.) He also thought a current psychological evaluation of Plaintiff would be helpful. (Id. ay 1040.)

Referring to the twenty mental activities listed on the Mental Residual Functional Capacity Assessment (MRFCA) form, Dr. Reid either assessed Plaintiff as being not

significantly limited in an activity or there being no evidence of any limitation in that activity.  (Id. at 1053, 1054-55, 1098.)

Dr. Reid appeared and continued his testimony at the July hearing.  Plaintiff and her husband were present.

The ALJ first asked Dr. Reid about Dr. Rexroat's report following his consultative examination of Plaintiff.[4]  (Id. at 1126-27.)  He replied that the report suggested that Plaintiff had four of the criteria for a depressive syndrome, i.e., sleep disturbance, psychomotor agitation, decreased energy, and difficulty concentrating or thinking.  (Id. at 1127.)  Still, she did not satisfy the B criteria.  (Id.)  He noted that there was no evidence of marked limitations and activities of daily living, of marked deficits in social functioning, or of marked deficits in concentration, persistence, or pace.  (Id. at 1128.)  After reading Dr. Rexroat's report, the only change he would make in his assessment of the activities listed on the MRFCA would be to change one activity from no evidence of any limitation to no significant limitation.  (Id. at 1130-31.)

After reviewing Dr. Gale's professional information, Dr. Reid repeated his earlier testimony that Dr. Gale was, as a licensed professional counselor with a Ph.D. in counselor education, unqualified to make a diagnosis relevant to axises one through five.  (Id. at 1133, 1134.)  He could, however, perform counseling services.  (Id. at 1134.)

Plaintiff testified that her dosage of Prozac had been increased to 40 milligrams by the psychiatrist to whom Dr. Gale had recently referred her.  (Id. at 1141.)

---

[4]See note 19, infra.

At the third hearing, Dr. Alex and Brenda G. Young, M.A., testified.  Plaintiff was present, but did not testify.

Dr. Alex testified that Plaintiff did not meet the listing criteria for chronic fatigue syndrome.  (Id. at 1154, 1165.)  She had one less trigger point (ten) than the number (eleven) required under the listings for fibromyalgia, but he considered her to be equal to the listing. (Id. at 1156, 1165-66, 1178.)  Although Plaintiff's rheumatologist, Dr. Speiser, thought she had non-ANA lupus, Dr. Alex did not.  (Id. at 1157, 1174, 1178, 1179.)  The ALJ noted that the record of Dr. Speiser cited by Dr. Alex referred to the diagnosis of lupus in the records of another doctor, Dr. Budd, that was suspected but never confirmed.  (Id. at 1157.)  The laboratory tests run by Dr. Budd in February 2005 did not detect the lupus anticoagulant.  (Id. at 1193.)  Plaintiff was, however, on medication to relieve the symptoms of lupus.  (Id. at 1172.)  Dr. Alex agreed that, based on the medical record, Plaintiff has osteoarthritis in the thoracic spine.  (Id.)

Ms. Young next testified as a VE.  She classified Plaintiff's past work as a photograph printer, a communications manager, and a telecourse coordinator as semiskilled and light work.  (Id. at 1201, 1203.)  Her job as a trading assistant in a brokerage firm was semiskilled and sedentary to light.  (Id. at 1204-05.)  Her transferable skills from her jobs included being able to effectively communicate with the public, maintain accurate records, schedule work, and various miscellaneous clerical skills, including using a computer.  (Id. at 1205.)

The ALJ then asked the VE to assume the following hypothetical person.

> [A]ssume that there's someone between age 37 and 49. . . . [A]ssume that this person has, at least from a physical standpoint, the physical capability to engage in the full range of sedentary work. . . . [A]ssume that she has physically the capability to put in a 40 hour a day week. I would also restrict her to a low stress, simple, repetitive work environment. . . . [C]learly that eliminates all of the past relevant work. Correct . . . ?

(Id. at 1207-08.)   The VE replied that it was correct and that the hypothetical also eliminated any job involving Plaintiff's transferable skills. (Id. at 1208.) Plaintiff's bachelor degree would simply indicate to a potential employer that she had the intellectual capacity to be trained. (Id. at 1208-09.) Such a hypothetical person could perform small product assembly jobs and sedentary cashier jobs in places without a high volume of traffic. (Id. at 1209-10.) These jobs existed in significant numbers in the state and national economies. (Id. at 1209.)

If the hypothetical person also was limited to not dealing with the public, she would not be able to perform the cashier jobs. (Id. at 1210.) If the person also had the limitations listed by Dr. Speiser in September 2008, was restricted to low stress, simple, repetitive tasks, and could sit for one hour at a time before needing to briefly stand and walk, she might be able to do such sedentary work as customer service and telephone reception types of jobs. (Id. at 1210-14.) If the person could sit for a total of only one hour a day, there were no jobs she could perform. (Id. at 1214, 1215.) If the person had a GAF of 55,[5] the

_____

[5]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV], the Global Assessment of Functioning [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."   DSM-IV at 34.

cashier jobs would be eliminated.  (Id. at 1215.)  A GAF of 50[6] would eliminate all jobs.

(Id.)  If the person also had the limitations described by Dr. Speiser in reaching, handling, fingering, seeing, and hearing – limitations not included when the ALJ summarized Dr. Speiser's report – she would not be able to perform the sedentary assembly and cashier positions.  (Id. at 1217-18.)

Asked by Plaintiff's counsel to assume a the hypothetical person who would miss more than four days of work a month due to mental and physical impairments, the VE replied that such a person would not be able to maintain a job.  (Id. at 1221.)  If the hypothetical person had the restrictions outlined by Dr. Gale, that person would be unemployable.  (Id. at 1224-25.)  Asked by the ALJ if a hypothetical person with the limitations described by Dr. Rexroat could do the small products assembly and cashier jobs, the VE replied that the cashier jobs would be eliminated, but not the small products assembly jobs.  (Id. at 1228-29.)

**Medical and Other Records Before the ALJ**

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from health care providers, and assessments by various examining and non-examining consultants.

---

[6]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 34.

Pursuant to her applications, Plaintiff completed a questionnaire in January 2004. (<u>Id.</u> at 277-80.)  She was not currently working because her illnesses – nephritis, chronic fatigue, immune dysfunction syndrome, depression, and anxiety – left her "mostly bedridden."  (<u>Id.</u> at 277.)  For example, she has to stop and rest after vacuuming a rug for only five minutes.  (<u>Id.</u>)  Her husband takes care of her more than she takes care of him. (<u>Id.</u> at 277A.)  She puts dishes in the dishwasher; her husband changes the bed linens.  (<u>Id.</u> at 278.)  She used to do all the lawn work, housework, shopping, and banking.  (<u>Id.</u>)  Before her illnesses, she had a lot of energy; now, she is in bed a lot.  (<u>Id.</u>)  On a good day, she will prepare supper.  (<u>Id.</u>)  After the first hour or two of sleep, she wakes up.  (<u>Id.</u>)  She tries to stay in her pajamas.  (<u>Id.</u>)  Taking a shower tires her.  (<u>Id.</u>)  During the day, she watches television or reads the paper.  (<u>Id.</u> at 279.)  She used to like to draw, but has not been able to because of fatigue and confusion.  (<u>Id.</u>)  Once or twice a week, her husband takes her to dinner or for a drive.  (<u>Id.</u>)  After an hour, she gets tired.  (<u>Id.</u>)  They have no social activities, and she no longer sees her friends.  (<u>Id.</u> at 279, 280.)

Plaintiff reported on a pain questionnaire that she aches in her joints and muscles; has sharp and then throbbing headaches; has pain in her kidneys and lower back; and has restless legs.  (<u>Id.</u> at 281.)  The pain is caused by fatigue and trying to do or handle too much.  (<u>Id.</u>)  To relieve her pain, she lies down; to relieve her headaches and fever, she lies down; to relieve her muscle and joint aches, she lies down and takes Naproxen or Advil. (<u>Id.</u>)  She calls her doctor or goes to the emergency room for her kidney pain.  (<u>Id.</u>)

Plaintiff also completed a Disability Report. (Id. at 290-98, 302-11.) Her height is 5 feet 4 inches; her weight is 226 pounds. (Id. at 290, 302.) Her illnesses first bothered her on February 28, 1996, and stopped her from working that same day. (Id. at 291, 303.) She stopped working because she kept getting sick and missing work. (Id.)

An earnings report for Plaintiff lists annual earnings from 1978 to 1996, inclusive. (Id. at 150.) Her lowest annual earnings were less than $1,000 in three years, between $1,000 and $5,000 in six years, between $5,000 and $10,000 in six years, between $10,000 and $15,000 in two, and between $15,000 and $20,000 in five years. (Id.) She has had twelve employers. (Id. at 150-54.) On a Work History Report, she listed a job as a photograph printer from 1980 to 1984, as a trading assistant in a brokerage from 1984 to 1993, and as a communications or media manager from 1993 to 1996. (Id. at 182.)

In March 2006, the office of Federal Student Aid notified Plaintiff that her student loans totaling $51,928.04 were discharged due to "total and permanent disability" as of January 30, 2003. (Id. at 555, 558.)

The relevant medical records before the ALJ are summarized below in chronological order and begin in 1994.[7]

_____

[7]This summary of Plaintiff's medical records does not include those dated after the date, March 8, 2005, she was found to be disabled unless their content is relevant to the issue of whether she was disabled before that date. Accordingly, the following are not discussed: Plaintiff's visits to Dr. Nester in August 2005 for lupus and in January 2006 for low back pain; visits in March, May, June, and August 2005, to John J. Budd, III, M.D., for a rash, joint pain, fatigue, or low energy; visits to James Speiser, M.D., in February, March, April, May 2006, July, August, September, and November 2007, and January, April, May, July, and August 2008 about lupus, sinus problems, ear problems, back, neck, or abdominal pain, left foot injury, osteoarthritis in the right knee, and/or fibromyalgia, and, in October 2007, stress and anxiety; visits in August, November, and December 2007 to Dr. Purcell for her hematuria; an x-ray of her thoracic spine

Plaintiff consulted Scott A. Kirchner, M.D., on January 18, 1994, for a sore throat and cough. (Id. at 600-01.) She returned six days later, reporting that she had been feeling run down, stressed, and unhappy with life for the past two months. (Id. at 601.) She did not like being single, was socially withdrawn, and was having difficulty bearing up under the demands of her job. (Id.) She was diagnosed with probable depression and prescribed Zoloft. (Id.) On February 1, she reported having an allergic reaction to the Zoloft. (Id. at 602.) She was in counseling, however, and attempting to change things that were adversely affecting her. (Id.) She was actively pursuing schooling and a change in jobs. (Id.) Her depression symptoms were less active. (Id.)

When Plaintiff next saw Dr. Kirchner, on March 14, she complained of nasal congestion and a fever, but did not mention depression. (Id. at 603.) Two days later, she reported an increase in job-related stress. (Id.)

Plaintiff was seen at Behavioral Health[8] on May 3 for symptoms during the past four months of no energy, feeling like crying, poor sleep, bizarre dreams, irritability, and poor concentration. (Id. at 488-90, 617-18.) Her current job of four years was the longest she had had. (Id. at 488.) She lived with her parents. (Id. at 489.) She was diagnosed with major depression and was prescribed Prozac, although she expressed a reluctance to take

_____

taken in August 2007 and revealing mild to moderate degenerative end plate changes in lower thoracic region and very mild scoliosis of upper thoracic spine; a sleep study in December 2006; and trips to an emergency room in May 2007 for abdominal pain and again in January 2008 for swollen legs and discolored toes. (Id. at 547, 565-66, 569-78, 581-83, 588-98, 688-89, 691-92, 697-735, 737-40, 750-55,765-809, 835, 840, 847-51.)

[8]There is no indication in the record of who saw her or of the credentials of that person.

medication.  (Id.)  She was to return in four to five months.  (Id. at 490.)  She did not, but did go to a pharmacy in October for a renewal of the Prozac.  (Id. at 490, 619.)

On September 14, Plaintiff consulted Dr. Kirchner about the diarrhea and cramps she had been having for two days.  (Id. at 605.)  She reported that she was dealing better with stress.  (Id.)  Her sleep and energy level were okay; her depression symptoms were under control.  (Id.)  Her only medication was Prozac.  (Id.)

On February 15, 1995, Plaintiff informed Dr. Kirchner that she had discontinued the Prozac on her own the previous October and had a recurrence of the symptoms of depression.  (Id. at 606.)  She was under stress due to her grandmother's illness.  (Id.)  In April, she consulted him about an ear infection and later about a tenderness in her jaw.  (Id. at 607.)

Plaintiff reported to Dr. Kirchner on May 15 that she was feeling very stressed and tearful.  (Id. at 608.)  She had been living with her mother, but her mother was now moving in with her boyfriend and Plaintiff had the stress of the increased costs of living alone.  (Id.)  Plaintiff had broken up with her boyfriend of seven years and was under significant job stress.  (Id.)  Her fatigue and crying spells had increased the last week.  (Id.)  Her coping skills were intact.  (Id.)  She was diagnosed with a stress adjustment reaction and was to be referred to stress management counseling.  (Id.)

On October 21, Plaintiff consulted Rebekah McPherson, LCSW (licensed clinical social worker), on the recommendation of her gynecologist that she seek "talk therapy" after becoming depressed and staying in bed for three days.  (Id. at 493-96, 626-29.)  She

reported that as a child she had witnessed her father beating her mother when he was drunk. (Id. at 493.) When she and her brothers got older, they intervened. (Id.) Recent television stories about spousal abuse had caused nightmares and flashbacks about the beatings. (Id.) She seldom drank, her last drink was six months earlier, but had been a heavy drinker in her 20s and was aware of the potential problems drinking caused. (Id. at 494.) She was neatly groomed and displayed good insight and judgment, but cried throughout the session. (Id. at 495.) She was diagnosed with posttraumatic stress disorder (PTSD). (Id. at 496.) Her current GAF was 58[9]; her GAF the past year was 70.[10] (Id.) She was to have eight to ten sessions. (Id.)

X-rays taken of Plaintiff's right ankle on January 18, 1996, and an ultrasound of her right leg to investigate her complaints of pain were normal. (Id. at 538-41, 622.)

Alex K. Mammen, M.D., first saw Plaintiff on February 1 for treatment of a swollen right leg and pain that radiated from her right heel up her leg. (Id. at 634.) Her diagnoses included an anxiety disorder. (Id.) Dr. Mammen saw Plaintiff again two weeks later. (Id. at 635.) At this appointment and one the following week, anxiety disorder was listed as a diagnosis but the treatment focused on her right leg and a yeast infection. (Id.) A notation referred to Plaintiff resigning her job. (Id.)

---

[9]See note 5, supra.

[10]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

On February 26, Plaintiff informed Dr. Kirchner that she had quit her job under duress and was changing physicians. (Id. at 609.) It was noted that she had never followed through on the arranged stress management counseling. (Id.)

The next, and only other, record of Ms. McPherson is a closing summary dated February 27 and listing Plaintiff's current GAF as 61.[11] (Id. at 497, 630.)

Plaintiff consulted Dr. Mammen on June 27 about her anxiety disorder and depression. (Id. at 636.) She was taking Xanax and was worried about her finances. (Id.)

Plaintiff sought treatment on August 14 from Mary Ann Roos, LCSW, with the Missouri Department of Mental Health after leaving her job that February and losing her health insurance. (Id. at 500-07, 648-55.) She was attending school full-time and pursuing a fine arts degree. (Id. at 500.) She was also in a long-term relationship with a chemically-dependent boyfriend who was verbally abusive and wanted to leave him. (Id. at 500, 502.) She was capable of self-care. (Id. at 655.) She presented with symptoms of depression, including crying spells, decreased energy and concentration, and mood swings. (Id. at 505.) A few weeks later, she was prescribed Xanax and Prozac and was to continue therapy. (Id. at 509, 657.)

When Plaintiff next saw Dr. Mammen, on September 20, her complaints were of a sore throat, ear pain, and sinus problems. (Id. at 636.)

---

[11]See note 10, supra.

On October 30, Plaintiff reported to Ms. Roos that the treatment was very helpful and she was only infrequently using the Xanax. (Id. at 508, 660.) She was not taking Prozac. (Id.) She had had some recent bad news, but had not become suicidal. (Id.) In December, she expressed concern that she should be on medication. (Id.) She denied any symptoms of depression and was functioning well at school and at work. (Id.) She had emotional ups and downs periodically due to problems with her boyfriend. (Id.) She thought she was looking at things differently and was not so obsessed with her problems. (Id.) She was not to be restarted on her medications and was to return as needed. (Id.)

Plaintiff saw a health care provider[12] with St. Louis Mental Health Services on May 14, 1997, for a final session, stating that she was feeling more confident, had occasional and brief periods of anxiety and depression, and had improved in her mood. (Id. at 518.) She was not on any anti-depressants. (Id.) With a physician, Dr. Dean, she discussed her fears about becoming depressed again. (Id. at 519.) They discussed the potential warning signs of depression. (Id.)

Plaintiff consulted Fred Rottnek, M.D., on September 26 about diarrhea, sinus problems, and a sore throat. (Id. at 522.) She was given Claritin D and told to call if her symptoms persisted or she felt worse. (Id.) Plaintiff returned on October 23. (Id. at 523-24.) She was to continue taking her current medications, call in two weeks for a consultation, and consult a registered dietician in his practice. (Id. at 524.) Dr. Rottnek signed the "SSI papers." (Id.) The dietician noted that Plaintiff was motivated to lose

---

[12]The name and credentials are illegible.

weight – she then weighed 216.5 pounds – and instructed her on a diet of 1800 calorie/60 grams of fat a day.  (Id.)  Plaintiff was to return in one month with her food diary.  (Id.)

The next day, Plaintiff went to St. Louis Mental Health Services and spoke with a LCSW.  (Id. at 521.)  She was taking 300 milligrams of St. John's Wort three times a day and requested counseling.  (Id.)  She had used her maximum of twelve sessions, however, and was referred to Provident.  (Id.)  It was noted that she had also been referred to Midwest Psychiatry for an evaluation, but she did not want to take antidepressants because of the negative side effects.  (Id.)

Plaintiff saw the dietician again on December 16.  (Id. at 525.)  She had lost two pounds and had forgotten to bring in her food diary.  (Id.)  She was given information on exercise and was to follow up in three to four weeks.  (Id.)

Ten days later, she saw Dr. Rottnek.  (Id. at 526.)  She was still taking St. John's Wort,  which she thought was helping.  (Id.)  She had had a few episodes of deep depression, but they were not as severe as before.  (Id.)  She was taking Ativan for anxiety. (Id.)  She had only taken one tablet, however, in the past couple of months.  (Id.)  Anxiety had not been "much of an issue lately."  (Id.)  She had not changed her eating habits, but had begun walking and was going to start a water aerobics program.  (Id.)

When Plaintiff next saw the dietician, on January 6, 1998, she had lost one pound. (Id. at 526.)  She had started her water aerobics class and was to return in six weeks.  (Id.)

Plaintiff saw another physician in Dr. Rottnek's practice on January 28 for complaints of lower back pain and hip stiffness.  (Id. at 528-29.)  On examination, she had

a full range of motion in her back and tenderness over her upper sacral area.  (<u>Id.</u> at 528.)

She walked with a limp.  (<u>Id.</u>)  She had equal reflexes and 5/5 strength in both lower

extremities.  (<u>Id.</u>)  She was diagnosed with radiculopathy or muscle strain and given back

exercises and a prescription for Naproxen.  (<u>Id.</u>)  She reported seven days later that her

back pain was better.  (<u>Id.</u> at 530, 532.)  She had been doing the recommended back

exercises, was walking each day, and was using a pillow when sleeping.  (<u>Id.</u> at 530.)  She

no longer needed a heating pad.  (<u>Id.</u>)  She reported that the Naproxen was helping.  (<u>Id.</u>)

She also reported that she was seeking counseling for recurrent depression.  (<u>Id.</u>)

Counseling had been helpful to her in the past.  (<u>Id.</u>)  She was allergic to Zoloft.  (<u>Id.</u>)

Prozac was helpful, but she did not like the side effects and preferred St. John's Wort.  (<u>Id.</u>)

On examination, she could bend 90 degrees without discomfort and was in no apparent

distress.  (<u>Id.</u>)  She had some mild tenderness to palpation to the left side of her lower back

and a mild "'twinge'" on that side.  (<u>Id.</u> at 529, 531.)  Her strength was 5/5 in her upper and

lower extremities.  (<u>Id.</u> at 531.)  Dr. Rottnek advised her to continue with her back

exercises and water aerobics.  (<u>Id.</u>)

Plaintiff returned to his office on April 16, reporting that she had been diagnosed

with panic attacks and depression.  (<u>Id.</u> at 531.)  She disagreed with the latter diagnosis and

thought she had something else.  (<u>Id.</u>)  She was to have an Epstein Barr test, was

encouraged to try Paxil, and was to continue with counseling.  (<u>Id.</u>)  Plaintiff telephoned

on July 1 that she was taking St. John's Wort again and was "feeling a bit depressed lately."

(<u>Id.</u> at 531.)

On April 4, 2000, Plaintiff had an annual physical performed by Dr. Rottnek.  (Id. at 534, 542.)  She was walking again with her dogs and was committed to losing weight, which was then 217 pounds.  (Id. at 534.)  She was not taking any anti-depressants.  (Id.) She was looking at a house that night with her new husband, was going to return to school that fall, and was considering having a baby the next winter.  (Id.)  Her depression was stable; she was alert and oriented to time, place, and person; and she was happy with life. (Id.)  Her strength was 5/5.  (Id.)

Two weeks later, Plaintiff had a nutritional consultation for her high cholesterol and low blood sugar.  (Id. at 478-79, 535.)  She reported having three meals a day that were high in fat and cholesterol and constantly snacking on such foods as chocolate, chips, and peanut butter crackers.  (Id. at 478.)  She was instructed on a low cholesterol diet and given tips about hypoglycemia and weight reduction.  (Id.)  She planned to start exercising.  (Id.)

Plaintiff went to the emergency room at St. Mary's Health Center on March 2, 2003, with complaints of neck pain and fatigue which she thought might be caused by a kidney infection.  (Id. at 468-77.)  Tests revealed a small amount of blood in her urine.  (Id. at 473, 475.)  She was discharged within three hours with instructions to continue with her present medications and follow up with her primary care physician within two to three days.  (Id. at 469, 477.)

Plaintiff first consulted Henry E. Purcell, M.D., for an evaluation of her hematuria[13] on March 24. (Id. at 463-64.) After summarizing the inception of her problem, attributed to a strep infection she developed at an IV site when in the hospital, and the course of the problem to date, Dr. Purcell decided to run a 24-hour urine test for protein. (Id.) That test was negative; however, the sed rate was high at 34.1.[14] (Id. at 462.)

When Plaintiff next saw Dr. Purcell, on June 25, she reported feeling better and having more energy. (Id. at 460-61.) There was no blood in her urine. (Id. at 460.)

Plaintiff completed an intake questionnaire for Dr. Gale on August 5.[15] (Id. at 451-54.) She was described as a self-employed artist for the past one to five years. (Id. at 451.) Her income was "[a]dequate." (Id.) Asked if she was disabled or receiving workers' compensation, Plaintiff marked the box labeled "No." (Id.) She was physically abused as a child and witnessed others being so treated. (Id. at 452.) She depended on her husband, family, and friends for emotional support. (Id.) Her medical conditions included allergies, kidney problems, and a problem with her immune system caused by a strep infection. (Id. at 453.) On a scale from one to ten, with ten being extreme pain, her current level was four.

---

[13]Hematuria is "[a]ny condition in which the urine contains blood or red blood cells." Stedman's Medical Dictionary, 773 (26th ed. 1995).

[14]A sed rate "is a blood test that can reveal inflammatory activity in [one's] body." Sed rate (erythrocyte sedimentation rate), http://www.mayoclinic.com/health/sed-rate/MY00343 (last visited Sept. 16, 2010). It is a diagnostic tool to detect rheumatoid arthritis, polymyalgia rheumatica, and giant cell artheritis. Id. In conjunction with other tests, it is also used to diagnose lupus. Sed rate, http://www.cure4lupus.org/store/index.php?main_page=page&id=170&chapter=1 (last visited Sept. 16, 2010). "Women should have a sed rate of less than 30." Id.

[15]The form is undated but a notation "8/5/03 LG" appears on the upper right-hand corner of the first page.

(Id. at 454.)  She was seeking counseling because her illness had disrupted her life for the past seven months and had caused great changes in her and her life style.  (Id.)

Steve Nester, M.D., treated Plaintiff for chronic fatigue syndrome on August 13.  (Id. at 551.)  Plaintiff reported hers and her husband's schedules conflicted and the conflict was interfering with her sleep.  (Id.)  She was prescribed a trial course of Trazodone.  (Id.)

Jacob P. Sosna, M.D., reported to Dr. Nester after examining Plaintiff on August 19 that Plaintiff began experiencing "some fatigue" in November 2002.  (Id. at 437.)  She related that she had had temperatures in the range of 99 to 100 from January through May 2003.  (Id.)  He described her examination as being unremarkable, as were the laboratory studies performed by Dr. Nester in February 2003 and April 2003.  (Id.)  "Her positive EBV [Epstein-Barr Virus] serologies simply reflect previous infection."  (Id.)

Plaintiff saw Dr. Nester on September 2 for her chronic fatigue, describing it as "[w]orse after activity and with variable activity."  (Id. at 444-45.)  "Some days [were] fine."  (Id. at 444.)  She did not have, among other things, any joint or muscle pain, decreased mobility, joint swelling, decreased visual acuity, anxiety, or depression.  (Id.)  Her medications included Difulcan, Terazol, Naproxen, and cyclobenzaprine.  (Id.)  No follow-up appointment was scheduled.  (Id.)  Her affect was normal.  (Id. at 445.)

Laboratory tests performed on October 27 at Dr. Nester's request list a sed rate of 32.[16]  (Id. at 440-43.)  That same day, Plaintiff saw Dr. Purcell.  (Id. at 458-59.)  She

---

[16]See note 14, supra.

reported feeling okay.  (Id. at 458.)  He suggested that she diet, lose some weight, and avoid eating large amounts of protein.  (Id.)

Plaintiff saw Dr. Nester again on January 9, 2004.  (Id. at 544.)  Several diagnoses were listed under the heading "Chronic Conditions": fibromyalgia, chronic fatigue, restless legs, chronic hematuria, and allergies.  (Id. at 544.)  Her weight was 224 pounds.  (Id.)  Laboratory tests performed three weeks later were unremarkable.  (Id. at 438-39.)  That same day, Plaintiff reported to Dr. Purcell that she was not feeling well.  (Id. at 457.)  She had had an upset stomach and diarrhea for the past two and one-half weeks.  (Id.)  Her urine was cloudy.  (Id.)

A March 4 computed tomography (CT) scan of her head to investigate the cause of her headaches revealed no definite abnormality.  (Id. at 682.)

Plaintiff consulted Dr. Nester on June 10.  (Id. at 434-35.)  His diagnoses was chronic fatigue, "mono," and PTSD.  (Id. at 434.)  She was to continue with her current medications, follow up as planned with Dr. Purcell, and resume taking Prozac.  (Id.)

Laboratory tests performed on July 28 showed a sed rate of 53, a 21-point increase since May 2004.  (Id. at 421.)  Her white blood cell count and C-reactive protein level[17] remained elevated at 3.37.[18]  (Id. at 422.)

----

[17]The level of C-reactive protein, produced by the liver, rises when there is inflammation. NIH, C-reactive protein, http://www.nlm.nih.gov/medlineplus/ency/article/003356.htm (last visited Sept. 10, 2010).

[18]This was also the level in May.  (Id. at 430.)

Laboratory tests done on January 12, 2005, revealed a sed rate of 65, a high level of glucose, and a high level of C-reactive protein. (Id. at 545-46.)

As noted above, the ALJ also had before him the reports of examining and non-examining consultants and evaluations by Plaintiff's physicians.[19]

Dr. Mammen wrote "To Whom It May Concern" on February 27, 1996, that Plaintiff was last seen in his office five days earlier for an anxiety disorder caused by a stressful work situation. (Id. at 485.) He reaffirmed this by a July 25 letter similarly addressed. (Id. at 484, 517, 642.)

In May 1996, Dr. Kirchner wrote that Plaintiff suffered from a stress adjustment reaction and had been initially diagnosed in January 1994 with a depressive illness. (Id. at 486, 491, 638.)

In January 1997, Dr. Mammon answered a questionnaire submitted by the Missouri Section of Disability Determinations (SDD), listing Plaintiff's mental problems as anxiety and depression and her treatment as Prozac and Darvocet. (Id. at 632-33.) Her impairments did not affect her daily activities or social functioning. (Id. at 632.) They did affect her concentration, persistence, or pace, but he did not clarify to what extent. (Id.) He had last seen Plaintiff in September 1996. (Id. at 633.)

_____

[19]As with the medical records, see note 7, supra, this summary of evaluations of Plaintiff do not include those performed after March 2005 unless relevant to the issue of her functioning prior to that date: specifically, a February 2008 psychological evaluation by Paul W. Rexroat, Ph.D.; a September 2008 assessment by Dr. Speiser of Plaintiff's physical ability to do work-related activities; an October 2008 psychosocial evaluation by Dr. Farzana; and an undated, unsigned evaluation by Dr. Farzana (apparently completed sometime after September 2008 given the context of the forwarding letter). (Id. at 811-28, 852-55, 907-10.)

In February 1997, Plaintiff underwent a psychiatric evaluation by Farida Farzana, M.D., pursuant to her applications. (<u>Id.</u> at 88-92, 512-16, 661-65.) Plaintiff reported that she lived by herself, had no energy, could not concentrate, and did not feel herself. (<u>Id.</u> at 512.) She described her problems as existing for several years, but she had not begun to receive treatment for them until 1994. (<u>Id.</u>) The psychiatrist, Dr. Dean, who was treating her at St. Louis Mental Health Agency had prescribed ten milligrams of Prozac in the morning and .25 of Xanax three times a day. (<u>Id.</u>) She stayed by herself, spent time doing household chores, and was restricted to her house by severe anxiety. (<u>Id.</u>) She cried a lot, had chest pains, and had difficulty breathing. (<u>Id.</u> at 512-13.) She had had to leave her job because of her nervousness and missing work. (<u>Id.</u> at 513.) She had quit college after three years because she felt overwhelmed. (<u>Id.</u>) She had a steady boyfriend. (<u>Id.</u> at 514.)

Plaintiff presented with a disheveled appearance and complained of not paying attention to herself. (<u>Id.</u>) She talked constantly and anxiously and had to be interrupted to elicit relevant information. (<u>Id.</u>) She was having difficulty sleeping, had low self-esteem, and felt helpless. (<u>Id.</u>) She had panic attacks. (<u>Id.</u>) She was oriented to time, place, and person. (<u>Id.</u>) She knew who the current president and the past two presidents were. (<u>Id.</u> at 514-15.) She had insight into her problems. (<u>Id.</u> at 515.) Dr. Farzana diagnosed Plaintiff with major depression, recurrent, without any psychotic features. (<u>Id.</u>) She also had symptoms of anxiety with panic attacks. (<u>Id.</u>) Her GAF was 51. (<u>Id.</u>) Her anxiety and depression negatively affected her ability to relate to others, including fellow workers and

supervisors, to understand and follow simple instructions, to maintain attention if around people, and to withstand the stress and pressure of day-to-day work.  (Id. at 515-16.)

The following month, March 1997, David W. Bailey, Psy.D., completed a Psychiatric Review Technique form (PRTF) for Plaintiff.  (Id. at 670-79.)  She was described as having an affective disorder – major depressive disorder – and an anxiety-related disorder, but no schizophrenic, paranoid, or other psychotic disorder.  (Id. at 670, 672-74.)  The affective disorder was manifested by a "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome," as evidenced by the diagnosis of depression by her physician.  (Id. at 673.)  It was not manifested by such behaviors as sleep disturbance, difficulty concentrating or thinking, decreased energy, or easy distractability.  (Id.)  The only evidence of her anxiety-related disorder was also the diagnosis of such.  (Id. at 674.)  Her two disorders resulted in a slight restriction of activities of daily living and moderate difficulties in maintaining social functioning.  (Id. at 677.)  The disorders often caused deficiencies in maintaining concentration, persistence, or pace, but never resulted in any episodes of decompensation of extended duration.  (Id.)

Dr. Bailey also completed a Mental Residual Functional Capacity Assessment (MRFCA) of Plaintiff.  (Id. at 666-69.)  Of twenty listed mental activities, Plaintiff was assessed as being markedly limited in none.  (Id. at 666-67.)  She was assessed as being moderately limited in her abilities to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to interact appropriately with the public; and to get along

with coworkers or peers without distracting them or exhibiting behavioral extremes. (Id.) Her abilities in the remaining sixteen activities either were not significantly limited or there was no evidence of a limitation. (Id.)

In December 1997, Dr. Rottnek completed an Accident & Health Claims Form: Continuing on behalf of Plaintiff, listing the diagnoses as major depression, recurrent, and anxiety disorder and opining that she was totally disabled as of February 22, 1996, to date. (Id. at 230.) He would be reviewing her status in April 1998.[20] (Id.)

Robert A. Zink, M.D., a physician in Dr. Nester's practice, completed a form letter to the Jury Commissioners for the City and County of St. Louis in May 2001 stating that Plaintiff should be permanently excused from jury duty due to anxiety. (Id. at 126.) Plaintiff's name and the diagnosis were the only additions to the one sentence letter. (Id.)

In an undated response to a questionnaire sent him by the SDD, Dr. Purcell reported that he had first seen Plaintiff in March 2003 and last seen her in October 2003. (Id. at 456.) Her diagnosis, hermaturia, did not prevent her from performing work-related functions. (Id.)

Larry Gale, Ph.D., LPC (licensed professional counselor), with Provident, wrote to the SDD on February 17, 2004, that Plaintiff was "involved in counseling to address depression."[21] (Id. at 450.) She was first seen March through August 2002 for complaints

---

[20]Dr. Rottnek completed another such form in December 1998 and again in October 1999. (Id. at 235-36.) Both listed the same diagnoses and same onset date. (Id.)

[21]Dr. Gale's treatment notes are not in the record; however, his statement listing 67 sessions for the period from March 8, 2002, to September 11, 2008, inclusive, is included. (Id. at 856-57.)

of anxiety and depression.  (<u>Id.</u>)  She "responded positively to cognitive therapy and did not want to resume pharmacotherapy."  (<u>Id.</u>)  She resumed counseling on August 5, 2003, for depression she attributed to chronic fatigue syndrome and immune dysfunction syndrome.  (<u>Id.</u>)  Her symptoms included lack of energy, anhedonia, irritability, depressed mood, insomnia, and low motivation.  (<u>Id.</u>)  Since that date, she had participated in eight sessions.  (<u>Id.</u>)  Her symptoms were described as interfering with her daily living, including preventing her from doing household chores and engaging in social and productive activities.  (<u>Id.</u>)  Dr. Gale opined that her mood swings, irritability, and lack of stamina precluded her from working "at this time."  (<u>Id.</u>)

Also that February, Dr. Nester wrote a note explaining that Plaintiff had had chronic fatigue syndrome for over one year and had had to hire a housekeeper to do household chores.  (<u>Id.</u> at 436.)

The following month, Charles A. Pap, Ph.D., a non-examining consultant, completed a PRTF for Plaintiff, assessing the period from July 2001 to the present and reporting that Plaintiff had an affective disorder, i.e., an adjustment disorder with depressed mood, and "some history of anxiety."  (<u>Id.</u> at 240-53.)  These impairments resulted in mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (<u>Id.</u> at 250.)  They did not result in any episodes of decompensation.  (<u>Id.</u>)

Dr. Pap separately assessed the period from March 1997 to June 2001.  (<u>Id.</u> at 258-71.)  For this period, he found insufficient evidence of an affective disorder, noting that

Plaintiff was attending college full-time in August 1996 and had obtained her Bachelor of Arts degree in 2002.[22]  (Id. at 261, 268, 270.)

Dr. Pap also completed a MRFCA of Plaintiff.  (Id. at 254-57.)  Of twenty listed mental activities, Plaintiff was assessed as being moderately limited in her abilities to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Id. at 254-55.)  There was no evidence of any limitation in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Id. at 255.)  In the remaining sixteen activities, Plaintiff was not significantly limited.  (Id. at 254-55.)

Dr. Nester wrote the following in April 2004:

> Ms. Cooper is a patient of mine who suffers from chronic nephritis and chronic fatigue syndrome.  She has difficulty holding down a job due to the extreme fatigue and need to rest frequently between periods of activity.  There is little hope for resolution in her condition or her symptoms over time.

(Id. at 433.)

In January 2008, Dr. Gale again assessed the effect of Plaintiff's mental impairments on her ability to perform various activities.  (Id. at 742-45.)  He concluded she had either marked or extreme limitations in all but one of the seventeen activities listed.  (Id. at 742-43.)  She had had four or more episodes of decompensation and had a substantial loss in her abilities to stick to a task; understand, remember, and carry out simple instructions;

---

[22]A notation in the record indicates that Plaintiff was last in school in 2003 and had started work on her Master's degree.  (Id. at 276.)

respond appropriately to supervision, co-workers, and ususal work situations; and deal with changes in a routine work setting. (Id. at 744.) The date of onset was 1994. (Id.)

In an undated, unsigned form,[23] Dr. Farzana completed a similar assessment, finding Plaintiff markedly limited in all but three of the seventeen activities listed and moderately limited in those three. (Id. at 905-07.) She also concluded that Plaintiff had a substantial loss in her abilities to stick to a tasks, respond appropriately to supervision, deal with changes in routine work setting, make judgments commensurate with the functions of unskilled work, and understand, remember, and carry out simple instructions. (Id. at 907.) These limitations had lasted, or could be expected to last, twelve continuous months. (Id.) The date of onset was February 25, 1997 (Id.)

Earlier in 2008, Paul W. Rexroat, Ph.D., had found during a psychological evaluation of Plaintiff that she had "extreme tendency to overstate problems." (Id. at 811-816.)

## **The ALJ's Decision**

The ALJ first noted that the alleged disability onset date had been amended to December 24, 1996, and that Plaintiff's applications filed that month remained opened because the Social Security Administration had not acted on her letter timely appealing the initial denial of those applications. (Id. at 13-14.)

The ALJ next proceeded to analyze Plaintiff's applications pursuant to the Commissioner's five-step sequential evaluation process, see pages 35 to 38, below. He first

---

[23]The context of the forwarding letter makes it clear that the author was Dr. Farzana and places the date after the September 2008 hearing.

found that Plaintiff had not been engaged in substantial gainful activity since her amended onset date. (Id. at 16.) He next determined that she had severe impairments of obesity, chronic fatigue syndrome, and depression as of December 24, 1996, through March 7, 2005. (Id.) After March 7, 2005, she had severe impairments of fibromyalgia, obesity, and depression. (Id.) In so concluding, the ALJ noted that, during the first period, Plaintiff had never been psychiatrically hospitalized, was attending school full-time, was benefitting from an infrequent use of Xanax, and had, as of June 1997, completed twelve counseling sessions to help her deal with various stressors. (Id.) The ALJ discussed Dr. Farzana's February 1997 report, but found more persuasive Dr. Reid's testimony that the record did not show a GAF level of 51 for at least twelve months. (Id. at 16-17.) After summarizing records of Dr. Rottnek and the other physician in his practice, including the references to Plaintiff taking St. John's Wort for depression and only one Ativan for anxiety during a period of a couple of months, the ALJ summarized those of Dr. Gale but declined to give his opinions and diagnoses any significant weight due to his credentials. (Id. at 17.) The ALJ did, however, give weight to the assessment of Dr. Rexroat, see note 19, supra, diagnosing Plaintiff with moderate recurrent major depression after administering tests that he, unlike Dr. Gale, was qualified to give and interpret and assessing her as having mild limitations of her ability to perform simple basic activities of daily living and in social interactions and as being able to understand and remember simple instructions and to sustain concentration and persistence on simple tasks. (Id. at 17-18.) The ALJ also discounted the 2008 opinion of Dr. Farzana that Plaintiff had been disabled since February

1997, based on that doctor's lack of personal knowledge of Plaintiff's long-term mental functioning and her apparent reliance on Plaintiff's statements. (Id. at 18.) The ALJ then concluded that since December 24, 1996, Plaintiff's recurrent major depression caused mild restrictions of her activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Id.) Consequently, her impairments did not meet or medically equal the criteria of Listing 12.04. (Id.)

The ALJ then addressed the question of Plaintiff's residual functional capacity (RFC) prior to March 8, 2005. In finding that she had the RFC to perform sedentary work[24] with the further limitation of being limited to low stress, simple repetitive tasks, he noted, inter alia, the diagnosis of fibromyalgia on March 8, 2005; Dr. Speiser's August 2008 observation that a diagnosis of lupus had never been confirmed and correcting his earlier office notes referencing such a diagnosis; the elevated C-reactive protein and sed rate testing showing inflammation but not useful for diagnosis of a specific impairment; a normal rheumatoid factor; and the January and April 2004 notes of Dr. Nester written when Plaintiff was seeking discharge of her education loans. (Id. at 19-22.)

Beginning on March 8, 2005, Plaintiff could not sustain work-related physical and mental activities on a regular basis and was disabled. (Id. at 22-23, 25.)

With her RFC prior to March 8, 2005, Plaintiff could not perform her past relevant work. (Id. at 23.) Based on her age, education, work experience, RFC, and the VE's

---

[24]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing." 20 C.F.R. § 404.1567(a).

testimony, Plaintiff could perform the requirements of small products assembler and cashier. (Id. at 24.) She was, therefore, not disabled before that date within the meaning of the Act. (Id. at 25.)

## Additional Medical Records Before the Appeals Council

When seeking review by the Appeals Council, Plaintiff submitted additional records from Drs. Nester and Farzana.

Dr. Nester wrote in January 2009 outlining Plaintiff's previous treatment and the attribution of her symptoms to various diagnoses and concluding that: "It is reasonable to infer that she had the same condition at the earliest time of my attending to her medical care [November 6, 2000] as she does currently. The diagnosis of these conditions is often retrospective and difficult to make in the early time-frame of the illness." (Id. at 919.)

In February 2009, Dr. Farzana wrote outlining Plaintiff's psychiatric history and noting, inter alia, that Plaintiff had begun counseling with Dr. Gale in April 2005. (Id. at 922-26.) Dr. Farzana supplemented that earlier report with a letter listing the medical records she had reviewed prior to writing in February and opining that Plaintiff is, and has been at least since February 1997, unable to work as a result of her severe recurrent depression and PTSD. (Id. at 920-21.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve

months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The

credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). <u>See</u> <u>also</u> 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, or "by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001). "If a mental impairment affects the claimant's ability to meet job demands other than

strength, the Guidelines are not directly applied but 'provide a framework to guide [the] decision.'" **King v. Astrue**, 564 F.3d 978, 981 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1569(a)). As noted, the Commissioner may meet his burden at this step by eliciting testimony by a VE in response to "a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997). "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Accord **Goff v. Barnhart**, 421 F.3d 785, 794 (8th Cir. 2005); **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999). Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question. **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record

to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Noting that she was last insured as of June 30, 2001, Plaintiff focused her arguments on her impairments from before that date through March 8, 2005. Those arguments are that the ALJ failed to (1) properly consider the October 2008 opinion of Dr. Farzana, erroneously giving more weight to the testimony of Dr. Reid, and (2) fully and fairly develop the record by assuming that Dr. Rottnek was referring to her job as a television activities assistant when completing the three insurance forms.

In February 1997 and again in Fall 2008, Dr. Farzana found Plaintiff to be disabled as of February 1997 by depression and anxiety. In February 1997, Dr. Farzana examined Plaintiff pursuant to her DIB and SSI applications and not because of any treatment

relationship.  See **Tindell v. Barnhart**, 444 F.3d 1002, 1005 (8th Cir. 2006) ("'Treating source' is defined as the claimant's own physician, psychologist, or other acceptable medical source' who provides the claimant with medical treatment or evaluation on an ongoing basis.").  As of that date, for psychological problems, Plaintiff had consulted Dr. Kirchner four times in 1994, twice in 1995, and once in 1996; a provider at Behavioral Health once in 1994; a LCSW once in 1995; Dr. Mammen once in 1996; and another LCSW thrice in 1996.  Her complaints of depressive or anxious symptoms were generally related to recent occurrences; for example, she complained to Dr. Kirchner at various times of job-related stress, stress related to her grandmother's illness, and stress caused by her mother moving out and by her breaking up with a longstanding boyfriend.  The situational character of her psychological problems is made more evident by her periodic reports of having her depression under control or not needing prescribed medication.  Moreover, Dr. Farzana's 1997 assessment is clearly based on Plaintiff's own complaints.[25]  See **Hilkemeyer v. Barnhart**, 380 F.3d 441, 446 (8th Cir. 2004) (holding that "the ALJ was justified in rejecting diagnoses of other mental disorders by sources who conducted a single examination of [claimant], and whose conclusions seemed to be based solely upon her subjective complaints").

Dr. Farzana reaffirmed her February 1997 findings in her October 2008 report. Plaintiff argues that this later report should also have trumped Dr. Reid's opinions. Although an ALJ may not substitute his opinion for that of a physician, the ALJ may "'reject

---

[25]The Court notes that Plaintiff does not argue the ALJ erred with respect to her credibility.

the opinion of any medical expert where it is inconsistent with the medical record as a whole.'" **Finch**, 547 F.3d at 938 (quoting <u>Estes v. Barnhart</u>, 275 F.3d 722, 725 (8th Cir. 2002)). <u>See</u> <u>also</u> **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (holding that the ALJ was entitled to give less weight to the opinion of a treating physician when that opinion was primarily based on claimant's subjective complaints rather than on objective medical evidence).

There is no record of Dr. Farzana seeing or otherwise treating Plaintiff between her two reports. Moreover, this second report is in a checklist-format. <u>See</u> **Randolph v. Barnhart**, 386 F.3d 835, 840 (8th Cir. 2004) (finding that the ALJ properly refused to give treating physician's opinion controlling weight when that opinion was in form of checklist and was given after physician had met with claimant only three times).

Plaintiff further argues, however, that the second opinion of Dr. Farzana is supported by other medical evidence, specifically, the similar opinions of Drs. Gale, Rottnek, Zink,[26] Nester, and Speiser. As to Dr. Gale, the ALJ agreed with Dr. Reid that his credentials did not give him the standing or authority to diagnose Plaintiff. Moreover, Dr. Gale's treatment notes are not included in the record and in his cited opinion he considered Plaintiff to be disabled eight years before he first saw her. Dr. Rottnek's cited opinions, reported on the three insurance forms, are unavailing for the reasons set forth below. There is no indication in the record that Dr. Zink ever treated Plaintiff, and his writing of her name and the word "anxiety" on a form letter asking that she be excused from jury duty is not supporting

---

[26]Plaintiff mistakenly spells Dr. Zink's last name as "Link."

evidence of a disabling mental impairment. Dr. Nester opined in January 2009 that it was "reasonable to infer" that Plaintiff had her currently disabling conditions, including fibromyalgia/chronic fatigue with autoimmune component, when she first saw him in November 2000. (<u>See</u> R. at 919.) His diagnosis of chronic fatigue syndrome was not made until 2003, two years after her date last insured.

After weighing the respective merits of Dr. Farzana's two opinions and Dr. Reid's testimony, the ALJ found the latter more persuasive. "'When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions.'" **<u>Wildman v. Astrue</u>**, 596 F.3d 959, 969 n.4 (8th Cir. 2010) (quoting <u>Wagner</u>, 499 F.3d at 849). The ALJ did so. His conclusion is supported by substantial evidence on the record as a whole.

Plaintiff next argues that the ALJ failed in his duty to fully and fairly develop the record by not seeking clarification from Dr. Rottnek whether he was referring only to Plaintiff's job as a television activities assistant when filling out the three insurance forms. (<u>See</u> R. at 21-22.)

"'Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press [her] case.'" **<u>Vossen v. Astrue</u>**, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting <u>Snead v. Barnhart</u>, 360 F.3d 834, 838 (8th Cir. 2004)). "The ALJ does not[, however,] 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'" **<u>Id.</u>** (quoting <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004)).

The forms at issue were completed by Dr. Rottnek in December 1997, December 1998, and October 1999. The basis for the reported disability was major depression, recurrent, and anxiety disorder. The onset date was February 1996. Plaintiff first consulted Dr. Rottnek in September 1997 – nineteen months after the onset date he reported – for diarrhea, sinus problems, and a sore throat – conditions unrelated to any mental impairments. Two weeks later, he signed SSI papers for her. In December, when he signed the form attesting to her inability to work due to depression and anxiety, she had only taken one Ativan, the medication she was prescribed by another physician for anxiety, in the past couple of months and reported that the herbal supplement she was taking was helping and her depression was not as severe as before. During the closest visit to his completion of the next form, she was continuing to take the herbal supplement and not the prescribed Prozac, although she described the latter as helpful. She was allegedly seeking counseling for depression and reported that counseling had been helpful to her in the past. She informed his office five months before he completed the form that she was "a bit depressed lately." There is no record of her seeing him during 1999. In April of the following year, however, she was not taking any anti-depressants and had married. See **Jones v. Astrue**, — F.3d —, 2010 WL 3396835, *10 (8th Cir. 2010) (affirming ALJ's decision rejecting disability claim of woman with anxiety and panic attacks who, during relevant period, met and married her husband).

In addition to Dr. Rottnek's conclusions on the three forms about Plaintiff's ability to work not being supported by the record, those conclusions also invade the province of

the Commissioner.  See **Vossen**, 612 F.3d at 1015 ("[O]pinions that a claimant is 'disabled' or 'unable to work' concern issues reserved to the Commissioner and are not the type of opinions which receive controlling weight.") (citing S.S.R. 96-5p (July 2, 1996)); accord **Brown v. Astrue**, 611 F.3d 941, 952 (8th Cir. 2010).

For the foregoing reasons, Plaintiff's second, and final, argument is unavailing.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.  "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently."  **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted) accord **Gowell v. Apfel**, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE
Dated this  22nd  day of September, 2010.